United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Aligned Bayshore Holdings, LLC, Plaintiff, | )<br>)<br>) |
| v. | ) Civil Action No. 18-21692-Civ-Scola<br>) |
| Westchester Surplus Lines Insurance Company, Defendant. | )<br>)<br>) |

**Order on Cross Motions for Summary Judgment**

Plaintiff Aligned Bayshore Holdings, LLC ("Aligned") claims Westchester Surplus Lines Insurance Company ("Westchester") breached an insurance contract by failing to cover damages it suffered as a result of Hurricane Irma. Before the Court are the parties' cross motions for summary judgment. (ECF Nos. 48, 49.) After reviewing the parties' written submissions and exhibits, and the applicable law, the Court **grants** Westchester's motion for partial summary judgment (**ECF No. 48**) and **denies** Aligned's motion (**ECF No. 49**).

**I.    Factual Background**

Westchester issued an insurance policy to Aligned that provided coverage for Aligned's windstorm and flood damage claims, including physical damage and business interruption to both Monty's Restaurant (the building) and the marina area. (ECF No. 48 at ¶ 2). On September 10, 2017, Aligned sustained losses due to the impacts of Hurricane Irma. (*Id.* at ¶ 3.) Aligned notified Westchester of its losses, but claims Westchester did not promptly pay all covered losses to Aligned. (ECF No. 6 at ¶¶ 9-11.) Aligned alleges that their damages exceed $15.5 million, with the majority of the damage sustained by the marina. (ECF No. 49 at ¶ 35.) Westchester has paid over $3 million in insurance claims to Aligned. (ECF No. 48 at 4.)

Aligned alleges in its breach of contract claim that Westchester willfully misinterpreted the insurance policy by improperly relying on an unverified statement of values to cap its coverage. (*See id.* at ¶ 19–20.) Westchester maintains that it properly interpreted the contract and has paid out the policy maximum under the insurance policy's flood coverage. (ECF No. 48 at 1.) Aligned also asserted a bad faith claim, which was dismissed without prejudice by this Court. (ECF No. 38.)

## II. The Insurance Contract

Westchester issued a commercial property policy, No. D37380118008, to Aligned for the year May 21, 2017 to May 21, 2018. (ECF No. 49 at ¶¶ 1-2.) The policy provides coverage for buildings, personal property, business interruption, improvements and betterments, and docks and piers. (ECF No. 48 at ¶ 2.) The insured property is a commercial property which includes a building, housing Monty's restaurant, and the outdoor marina and piers. (*Id.*). The insurance policy covers various "causes of loss," including flood damage. (ECF No. 47-1 at 14.)

The insurance policy contains Commercial Property Declarations (the "Commercial Declarations"), which provide coverage of up to $12,250,000 as per the "[m]ost recent schedule on file with Company." (*Id.* at 10.) The parties agree that the schedule referenced in the Commercial Declarations is a statement of values. (ECF No. 49 at ¶ 8; ECF No. 55 at ¶ 8.) The statement of values, which is incorporated by reference in the contract, sets out the property value and thus the limit of insurance for each insured item. For example, the building is insured up to $6,250,000, the docks up to $2,000,000, personal property up to $1,000,000, and so on, equaling a total of $12,250,000 in insurance coverage. (ECF No. 49 at ¶ 11.) The Commercial Declarations set out the following information with regard to "location" and "coverages and limits provided."

Company: **Westchester Surplus Lines Insurance Company**
SYM: FS    Policy ID: **D37380118 008**

| Location | | | | | | |
|---|---|---|---|---|---|---|
| | [X] Most recent schedule on file with Company totaling $ **12,250,000**. | | | | | |
| | [ ] See attached Schedule CPs2 | | | | | |
| | Loc. No. | Bld. No. | Address | | | |
| | | | | | | |

| Coverages and Limits Provided | Insurance At Described Location Applies Only For Coverages For Which A Limit Of Liability Is Shown | | | | | |
|---|---|---|---|---|---|---|
| | Loc. No. | Bld. No | Coverage | Covered Causes of Loss Form | Co-Insurance % | Limit of Insurance $ |
| | All | All | Buildings, Personal Property, Business Income Including Extra Expense, Improvements and Betterments and Docks, Piers | Special | NIL | $12,250,000 per occurrence primary (per schedule, not blanket) |

(ECF No. 47-1 at 10.)

The insurance policy also contains Flood Endorsements Declarations ("Flood Declarations"). The Flood Declarations set out a reduced limit for flood insurance: $10,000,000 per occurrence. (*Id.* at 14.) The Flood Declarations states that "[t]he Flood limit is not a separate or additional Limit of Insurance. . . . The Reduced limit does not apply separately to the Premises, Locations,

Covered Property or Coverages listed. It is the most we will pay for all loss or damage to the indicated Covered Property/Coverages at the Premises and Locations listed, subject to all other applicable policy provisions." (*Id.* at 14-15.) The Flood Declarations incorporate by reference the Commercial Declarations:

| Location Information | Covered Locations for Flood are the same as the Covered Locations shown in the Commercial Property Declarations, subject to the following exceptions:<br>Exceptions: (applicable if indicated by an X)<br>☐<br>☐ No Flood coverage is provided under this endorsement for Locations wholly or partially <u>located within</u> the following Federal Emergency Management Agency (FEMA) Flood Zones: |
|---|---|
| Coverage Information | Covered Property and Coverages for Flood are the same as the Covered Property and Coverages shown in the Commercial Property Declarations and in the Sub-Limit Provision Endorsement, subject to the terms of the Flood Coverage Endorsement and the following exceptions:<br>Exceptions: |

(*Id.* at 14.)

The policy also contains a Flood Coverage Endorsement ("Flood Endorsement"). (ECF No. 47-1 at 96.) The Flood Endorsement references the Flood Declarations and states that "[t]he Limit of Insurance for Flood is shown in the Flood Coverage Schedule or the Declarations. . . The Limit of Insurance for Flood is the most we will pay in a single occurrence of Flood for loss or damage caused by the Flood." (*Id.* at 98.)

The parties dispute whether the $10 million flood coverage limit is "blanket" coverage or if it is subject to a statement of values. (ECF No. 49 at ¶ 11.) In other words, whether it is limited by the value of each covered property. Aligned argues that the policy provides blanket coverage for flood damage. Westchester argues that the policy's flood coverage is subject to a statement of values. Moreover, even if the Plaintiff agreed that a statement of values applies, the parties dispute *which* statement of values applies here. (*Id.* at 15.)

### III. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. In reviewing a motion for summary judgment, the Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about

the facts in favor of the non-movant." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1143 (11th Cir. 2007)). So, when a conflict arises between the facts presented by the parties, the Court must credit the nonmoving party's version. *Id.* The moving party bears the burden of proof to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

## IV. Analysis

### A. Whether a Statement of Values Applies to Flood Coverage

Aligned moves for summary judgment on its claim for breach of contract arguing that the insurance policy creates blanket coverage for flood damage up to $10 million. (ECF No. 49 at 9.) Blanket coverage means that it is not subject to a statement of values. In other words, the value of each covered property is not taken into consideration by Westchester when paying an insurance claim. Aligned points to language in the contract as well as the absence of the words "statement of values" or "schedule" in the Flood Declarations and the Flood Endorsement to conclude that the statement of values does not apply. According to Aligned, if Westchester wanted to write a flood policy that was subject to a statement of values, it could have done so. (*Id.* at 11.)

On the other hand, Westchester moves for summary judgment arguing that it has paid the limits of the flood coverage based on the statement of values on file with the company. To date, Westchester has paid Aligned $3,033,216.76 for damages caused by Hurricane Irma. (ECF No. 48 at ¶ 10.) According to Westchester, this is the maximum due under the policy and coverage limits set out in the statement of values. (*Id.*) The statement of values, as applied by Westchester, is the following:

| Bldg No. | Property Type | Location Name | Real Property Value | Personal Property Value | BI/Rental Income | Total TIV | Occupancy Description |
|---|---|---|---|---|---|---|---|
| 1 | Building | Montys | $6,250,000 | $1,000,000 | $2,000,000 | $9,250,000 | Office/Restaurant |
| 2 | Outdoor Prop | Marina | $2,000,000 | | $1,000,000 | $3,000,000 | Docks/Piers/Marina |

(ECF No. 47-12.) Under this statement of values, Aligned may claim up to $6,250,000 for damage to the Monty's building, $1,000,000 in personal property losses, and $2,000,000 in business interruption loss. Aligned may also claim up to $2,000,000 for damage to the marina and $1,000,000 for business interruption and rental income loss related to the marina. Therefore, the maximum that Aligned can recover for the marina is $3,000,000. Westchester has paid out the maximum under its interpretation of the policy. However,

Aligned believes the entire $10 million of coverage should apply to the marina, without reference to a statement of values. The Court disagrees.

In construing insurance contracts, Courts must "apply a construction that is practical and reasonable as well as just." *Weldon v. All American Life Ins. Co.*, 605 So. 2d 911, 915 (Fla. 1992). "[I]nsurance policies will not be construed to reach an absurd result." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Case Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998.) "[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000).

Here, the policy contains the Commercial Declarations and the Flood Declarations. The parties agree that the Commercial Declarations incorporate by reference the statement of values. (ECF No. 49 at ¶ 8; ECF No. 55 at ¶ 8.) The Commercial Declarations set out the "location" as: "Most recent schedule on file with the Company totaling $12,250,000." (ECF No. 47-1 at 10) The Flood Declarations set out the location as: "Covered Locations for Flood are the same as the Covered Locations shown in the Commercial Property Declarations[.]" (*Id.* at 14.) The Commercial Declarations also set out the "Coverage and Limits Provided" as: "$12,250,000 per occurrence primary (per schedule, not blanket)." (*Id.* at 10.) The Flood Declarations also incorporate this language: "Covered Property and Coverages for Flood are the same as the Covered Property and Coverages shown in the Commercial Property Declarations[.]" (*Id.* at 14.) Aligned argues that the Flood Declarations, unlike the Commercial Declarations, do not mention a statement of values or schedule. (ECF No. 49 at 10-11.) As shown above, however, the Flood Declarations explicitly refer to and incorporate the Commercial Declarations. (ECF No. 47-1 at 14.) Therefore, the statement of values applies to flood coverage.

Moreover, the Flood Declarations set out a "reduced limit" for flood coverage. Instead of the policy's $12,250,000 coverage limit, the Flood Declarations creates a reduced limit of $10,000,000. (*Id.*) The Flood Declarations state: "The Flood limit . . . is part of and included in the Limit of Insurance which applies to other Covered Causes of Loss . . . the Flood limit **is not a separate or additional Limit of Insurance**." (*Id.*) (emphasis added). Furthermore, the "Reduced Limit **does not apply separately** to the Premises, Locations, Covered Property or Coverages listed. It is the most we will pay for all loss of damage to the indicated Covered Property/Coverages at the Premises and Locations listed, **subject to all other applicable policy provisions**." (*Id.* at 15.) (emphasis added). One such applicable provision is the "Occurrence Limit of Liability Endorsement." (ECF No. 47-1 at 75.) Under this endorsement, which applies to all commercial property coverage, "[t]he premium for this policy is based upon

the Statement of Values on file with the Company." (*Id.*) Reading the policy as a whole, flood coverage is not to be interpreted as a separate or additional coverage scheme. *See Anderson*, 756 So. 2d at 34 ("[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full and operative effect."). Under the plain meaning of the policy's language, flood coverage is subject to the same limitations as the rest of the policy, including the statement of values. *Id.* at 33 (policy must be construed "in accordance with the plain language of the policy as bargained for by the parties"). Reading it otherwise would mean that Westchester agreed to cover the individual parts of the property well beyond their property value and would render the statement of values meaningless. *See Pacific Employers Ins. Co. v. Wausau Business Ins. Co.,* 508 F. Supp. 2d 1167, 1175 (M.D. Fla. 2007) ("terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation").

Aligned also argues that the Commercial Declarations do not apply to all coverage parts as per the Forms Schedule. (ECF No. 49 at 10.) The Forms Schedule is similar to a table of contents that sets out general provisions which are "applicable to all coverage parts" and then the "commercial property" provisions. (ECF No. 47-1 at 8.) According to Aligned, because the Commercial Declarations are not in the "applicable to all coverage parts" section, they must not apply to flood coverage. As argued by Westchester, interpreting the policy this way would be absurd. (ECF No. 55 at 13.) As discussed above, the Flood Declarations incorporates by reference the Commercial Declarations. Moreover, the policy should be read as a whole to give every provision meaning and effect. Reading the Commercial Declarations in isolation would mean the Commercial Property Supplemental Declarations, identifying the names of the insureds, would also be inapplicable to flood. Such a result is untenable.

### B. Which Statement of Values Applies

Having determined that *a* statement of values applies to flood coverage, the Court must also determine *which* statement of values applies. Westchester maintains that the correct statement of values is the following:

| Bldg No. | Property Type | Location Name | Real Property Value | Personal Property Value | BI/Rental Income | Total TIV | Occupancy Description |
|---|---|---|---|---|---|---|---|
| 1 | Building | Montys | $6,250,000 | $1,000,000 | $2,000,000 | $9,250,000 | Office/Restaurant |
| 2 | Outdoor Prop | Marina | $2,000,000 |  | $1,000,000 | $3,000,000 | Docks/Piers/Marina |

(ECF No. 47-12.) Aligned argues that it never received or approved the above Statement of Values (the "SOV"). The applicable statement of values, according

to Aligned, is the Premises Schedule first submitted with Aligned's commercial insurance application on June 2, 2017. (ECF No. 54 at 11.)

| PREMISES INFORMATION | PREMISES #: 1 | STREET ADDRESS: 2550 S Bayshore Drive | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | BUILDING #: 1 | BLDG DESCRIPTION: Office Building, Restaurant, Docks, Piers, Marina | | | | | | |
| SUBJECT OF INSURANCE | AMOUNT | COINS % | VALUATION | CAUSES OF LOSS | INFLATION GUARD % | DED | DED TYPE | BLKT # | FORMS AND CONDITIONS TO APPLY |
| Building | 6,250,000 | | AA | Special form | | | | | 5% N W&H* |
| Boat Dock | 2,000,000 | | AA | Special form | | | | | 5% N W&H |
| Personal Property | 1,000,000 | | AA | Special form | | | | | 5% N W&H |
| Building | 350,000 | | AA | Special form | | | | | 5% N W&H |
| BI w/ Extra Expense | 3,000,000 | | | Special form | | | | | 5% N W&H |
| ADDITIONAL INFORMATION | X | BUSINESS INCOME / EXTRA EXPENSE - Attach ACORD 810 | | | VALUE REPORTING INFORMATION - Attach ACORD 811 | | | | |

(ECF No. 47-2 at 10.) The only relevant difference between Westchester's SOV and Aligned's Premises Schedule is that the business interruption/extra expenses value is not divided between the building and the marina. (ECF No. 54 at ¶ 14.) Under Westchester's SOV, Aligned can recover business interruption loss up to $1,000,000 for the marina and $2,000,000 for the building. Under Aligned's Premises Schedule, Aligned can recover $3,000,000 in business interruption loss regardless of whether it is associated with the marina or the building.

Aligned's primary argument is that the author of the SOV, Glenn Peterson, an insurance broker, is not Aligned's agent and Aligned did not know he was involved in the insurance renewal process with Westchester. (ECF No. 54 at 15.) According to Aligned, Peterson himself thought the Premises Schedule was the correct schedule. (*Id.* at 16.) Westchester argues that Peterson's agency relationship with Aligned is irrelevant because Rick Alvarez, the marketing manager with the insured's retail agent, *is* Aligned's agent, reviewed the SOV, and discussed it with Aligned. (ECF No. 66 at 2.) The Court agrees.

Aligned does not dispute that Alvarez is its agent. (*See* ECF No. 54.) Alvarez testified that he met with Jose Hevia, owner and president of Aligned Bayshore, Renae Asher, CFO of Prime Marina Group, and Tony Arias, insurance consultant for Aligned, to discuss the renewal of Aligned's insurance policy with Westchester. (ECF No. 48-2 at 26-27.) During that meeting, Hevia informed Alvarez that he wanted to reduce Aligned's coverage for the upcoming year. (*Id.* at 29.) The real property value was reduced from $7,000,000 to $6,250,000, the marina from $3,000,000 to $2,000,000, and the business interruption expenses were divided between the building ($2,000,000) and the marina ($1,000,000). (*Id.* at 29, 38-39.) These values were correctly reflected in the SOV, which Alvarez reviewed once it was created by Peterson. (*Id.* at 36.) When asked about the division of the $3,000,000 in business interruption expenses between the

building and marina, Alvarez testified that it had been that way for the "previous two years probably." (*Id.* at 139-140.) He also testified that he told Aligned that these were the limits, including the separation of the business interruption expenses between building and marina. (*Id.* at 140.) In fact, when asked if he considers the application for insurance a schedule of values, he responded, "No, it's not the Schedule of Values." (*Id.* at 102.) This is also consistent with Peterson's testimony that the document submitted with the application is not a statement of values because it is titled "Subject of Insurance." (ECF No. 47-4 at 159:10-22 ("Actually, I don't agree because that's not a schedule. . . there is nothing on here that says anything about Schedule of Values and/or Statement of Values.")). Both Alvarez and Peterson testified that the SOV was the only statement of values on file with Westchester. (ECF No. 48-2 at 92; 47-4 at 24.) The evidence that Aligned points to for the argument that Peterson believed that the Premises Schedule was the correct schedule is an inconclusive email. (ECF No. 47-14 at 2.) In this email, Peterson asks someone from Westchester whether the $3,000,000 limit for business interruption, "$2,000,000 at the restaurant and $1,000,000 at the marina," is "one limit." (*Id.*) There is no response in the email chain. At most, this shows that he was aware of the division between the restaurant and marina but was asking how it was to be applied.

Aligned's only attempt to refute that Alvarez was acting on instructions from Hevia is a one sentence denial without a citation to the record. (ECF No. 54 at ¶ 12 ("Hevia did not instruct Mr. Alvarez to reduce the limits by the amounts stated.")). Therefore, the Court will "not consider evidence, if there is any, supporting the assertions for which the plaintiff provided no citations to the record." *Pye v. Fifth Generation, Inc.* No. 4:14CV493-RH/CAS, 2016 WL 9046788, at *2 (N.D. Fla. Sept. 27, 2016). Accordingly, the Court finds that there is no dispute that Alvarez, as Aligned's agent, was acting on Hevia's instructions when he procured a policy based on the SOV, which was the only SOV on file with Westchester. The Defendant is entitled to summary judgment.

## V. Conclusion

The Court therefore **grants** Defendant Westchester's motion for partial summary judgment (**ECF No. 48**.)[1] and **denies** Aligned's motion for summary judgment. (**ECF No. 49**.) Although styled a motion for "partial" summary judgment, the Court believes granting the motion resolves the entire dispute between the parties. The Court therefore directs the Clerk to **close** this case and

---

[1] The Court instructed the Defendant to re-file its motion for summary judgment and correct its citations to the record. The corrected motion is **ECF No. 85**. Accordingly, the Clerk is directed to **terminate** this motion.

to **remove** it from the trial calendar. Any pending motions in this case are **denied as moot.**

**Done and ordered** in chambers, at Miami, Florida, on June 17, 2019.

_____
Robert N. Scola, Jr.
United States District Judge